UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | |
|---|---|
| _____ } | |
| CAMBRIDGE TAXI DRIVERS AND OWNERS } | |
| ASSOCIATION, INC. } | |
|      PLAINTIFF } | |
| } | |
| v. } | |
| } | |
| CITY OF CAMBRIDGE, MASSACHUSETTS, } | Civil Action No.: |
| NICOLE MURATI FERRER, CHAIR OF THE } | |
| CAMBRIDGE LICENSE COMMISSION, } | |
| E. DENISE SIMMONS, MAYOR OF CAMBRIDGE, } | |
| CHRISTOPHER BURKE, } | |
| CAMBRIDGE POLICE COMMISSIONER, and } | |
| RICHARD C. ROSSI, CITY MANAGER } | |
|      DEFENDANTS } | |
| _____ } | |

## COMPLAINT

### I.    Introduction

1. Plaintiff is an entity comprised of members who are taxi drivers and owners that operate and engage in the licensed taxi industry in Cambridge. They have brought this case because the City of Cambridge (the "City") has arbitrarily violated their constitutional rights by applying burdensome and costly Taxi Regulations to them, while permitting so-called Transportation Network Companies (hereinafter "TNCs") (for example, Uber, Lyft, Sidecar and others) to compete without complying with those requirements or incurring the very large costs the City imposes on the Plaintiff's members. Both the Plaintiff's members and the TNCs engage in the very same business – driving individual passengers on demand for hire ("For-Hire Transportation").

2. The City is violating Plaintiff's constitutional rights to just compensation, equal protection and due process by arbitrarily:

   a. Requiring taxi operators to buy expensive City taxi licenses (known as "medallions") which have in recent years cost hundreds of thousands of dollars each, while destroying their most essential property right and much of their value by allowing the TNC's to operate without them.

   b. Imposing more onerous burdens on the taxi industry, as compared to the TNCs (also referred to herein as "de facto taxi companies"), even though both engage in the same business – For-Hire Transportation. The City requires members of the taxi industry to spend hundreds of thousands of dollars per taxi to engage in the taxi business and to comply with its vast set of regulations, while the City permits the de facto taxi companies to compete in the same business without following or abiding by any regulations whatsoever.

   c. Imposing extensive, costly and burdensome safety-related obligations on the taxi industry, but not on the TNCs.

3. The Plaintiff has brought this lawsuit because the City now permits by law the de facto taxi companies to operate without complying with the Taxi Regulations even though they engage in the same business as Plaintiff's members, For-Hire Transportation (i.e., they transport people from place to place using a vehicle for a fare).

4. The City previously limited the number of taxicab permits and required taxicab medallion owners to go to a secondary market and spend hundreds of thousands of dollars to obtain a medallion, the City has now irrationally destroyed all value of those medallions.

5. The Plaintiff's members have invested substantial capital in complying with the City rules and state laws, developed over the last eighty years, that protect consumers, ensure public safety and provide non-discriminatory service.

6. The TNCs have created an illegal transportation system that violates state law and Cambridge City ordinances.

7. The Plaintiff seeks declaratory and injunctive relief and monetary damages.

## II. PARTIES

8. Plaintiff and Defendants are as follows:

   a. Plaintiff, Cambridge Taxi Drivers and Owners Association, Inc., is a Massachusetts non-profit corporation with a principal place of business at 126 Pennsylvania Avenue, Somerville, Massachusetts 02145. This entity represents individuals who collectively own 240 Medallions of taxicab medallions in the City of Cambridge.

   b. The Plaintiff's members are directly and detrimentally impacted by the lack of enforcement of existing taxicab laws as to the TNC's and their drivers.

   c. Defendant, City of Cambridge, is a Massachusetts municipality with a principal place of business located at City Hall, Cambridge, Massachusetts. The City of Cambridge has the legal authority to regulate the hackney carriage industry.

   d. Defendant, Christopher Burke, Police Commissioner, has the legal authority and obligation per state statute and local laws to regulate the hackney carriage industry.

e.  Defendant, Nicole Murati Ferrer, Chair of the Cambridge License Commission, has the legal authority to regulate and license the hackney carriage industry and the so called TNCs within the City of Cambridge.

f.  Defendant, Denise Simmons, Mayor of Cambridge, has the legal authority to regulate and license the hackney carriage industry and the so called TNCs within the City of Cambridge.

g.  Defendant, Richard C. Rossi, City Manager, has the authority to regulate and license the hackney carriage industry and the so called TNCs within the City of Cambridge.

## III.  FACTUAL ALLEGATIONS

9.  The Cambridge taxi industry is highly regulated by state statutes, city rules and ordinances and multiple agreements that specify how medallion owners, drivers and radio associations must operate together.  These legal controls are designed to ensure that taxi services in Cambridge will operate safely, reliably and without discrimination.

10. The Massachusetts legislature has given the City of Cambridge, and all other cities and towns across the Commonwealth, authority to regulate all vehicles used for the conveyance of persons for hire from place to place.  See M.G.L. c. 40, § 22 and M.G.L. c. 159.

11. The City, pursuant to the powers vested in it by the Massachusetts legislature, through the License Commission and pursuant to City of Cambridge Ordinance c. 5.20, enacted the Taxicab Rules and Regulations, a 63 page document governing the taxicab industry (see Exhibit A) (hereinafter "Taxi Regulations").

12. The current version of Taxi Regulations is the product of decades of revisions, designed to protect consumers, ensure public safety, safeguard competition, and provide non-discriminatory taxi services to all areas of the city and to the elderly and disabled.

13. The Plaintiff's members and all medallion owners operating in Cambridge have invested significant capital and resources to develop systems of infrastructure that meet the City's broad requirements.

14. The rules are elaborate, highly detailed and very restrictive, controlling virtually every aspect of the taxi businesses.

15. Cambridge's Taxi Regulations are designed to ensure that Cambridge's taxi services are safe, reliable and non-discriminatory.

16. The City issues a limited number of taxi licenses, called taxi medallions.  A taxicab cannot operate in Cambridge without one of the 257 city-issued taxi medallions.

17. Drivers of taxicabs must be licensed, meet a minimum age requirement, register the automobile in the City of Cambridge and pay certain taxes in order to be eligible to drive a taxicab.  They also must provide their contact information to the License Commission.

18. Medallion owners must train and supervise each driver operating their taxicab on various issues, including conducting an eight (8) hour ride along training.  Each taxicab driver must attend the Cambridge Taxi School and must pass a written taxi drivers' exam prior to the issuance of a taxicab driver's license.

19. The de factor taxi companies are not subject to any of these requirements.  They are not licensed through the City nor does the automobile have to be registered in the City.  Further, the TNC drivers do not undergo the eight (8) hour training or attend the Cambridge Taxi School or pass a written taxi drivers' exam.

20. Medallion owners must have taxicabs that meet strict requirements concerning vehicle age, condition, color, logo, design and markings.

21. The de facto taxi companies are not subject to any of these requirements.

22. In addition, the City requires taxi owners to pay large sums for the "exclusive" license to engage in the business of For-Hire Transportation.

23. For decades, taxi owners accepted these burdens and expenses as part of a quid pro quo with the City for the exclusive rights granted.

24. The City promised, in return, that taxi owners, and the taxi affiliations and drivers who operate taxis, would have the exclusive right to provide For-Hire Transportation to individual passengers.

25. In reliance on the City's decades-long promise of exclusivity, taxi owners have invested millions of dollars in the taxicab industry.

26. The City of Cambridge expressly limited the number of taxicabs medallions issued.

27. The City of Cambridge expressly provided that the medallions were assignable, and provided specific rules relative to the assignment.

28. The City of Cambridge required that each transfer was approved by the City, and acknowledged that the medallions were financed in the regulations (see Exhibit B attached hereto).

29. In addition, the City of Cambridge auctioned medallions off in order to generate revenue for the City.  The medallions were auctioned for $450,000 each.

30. Under the circumstances and for many decades, the City of Cambridge, pursuant to its own ordinances, fostered and participated in the assignment of the taxicab medallions.

31. The City created a public market place for the assignment for taxicab medallions.

32. As a result, the City created more than just a mere personal permit granted by a governmental body.

33. Medallions were securely and durably owned and marketable.

34. The Plaintiff's members have a property interest in their taxi medallions.

35. Every taxi driver must have a Driver's License and comply with the extensive rules of conduct promulgated by the City of Cambridge (for example, requirements for dealing with handicapped passengers, allowed fares and charges, meter requirements, anti-discrimination requirements and prohibitions on cell phone use).

36. The de facto taxi drivers do not have to comply with the same rules and requirements.

37. Each taxi driver is also required to carry expensive primary commercial liability insurance that applies whenever taxis are picking up, carrying or looking for passengers, or even when off duty.

38. The de facto taxi drivers are not required to carry the same such insurance.

39. A standard insurance policy for a car that is not transporting passengers contains an exclusion for transporting people for hire and current policies includes a warning for no coverage if private cars are involved in transporting passengers for hire.  So, most de facto taxi drivers are operating with insurance that excludes the use and for which coverage would not apply.

40. The hallmark of the marketplace in transportation services created by the heavily regulated industry had been competition on a level playing field.

41. Taxi owners and drivers worked in a competitive environment, all subject to the same regulations – until the advent of unregulated providers that gives rise to this Complaint.

42. The For-Hire Transportation business consists of four simple elements, whether the service is provided by a taxi or a TNC: a driver, a vehicle, a passenger and payment. These elements do not depend on how the connection between driver and passenger is made, whether visual (by street hail or taxi queue), or electronic (by telephone, smartphone or web site).

43. For decades the City heavily regulated all For-Hire Transportation providers under uniform rules. The rules were designed to protect the public, regulate traffic, address congestion and provide public service.

44. The de facto taxi companies (such as Uber, Lyft and Sidecar) do exactly the same thing that traditional taxi companies do. They dispatch drivers to passengers who pay fares based on the time and distance traveled.

45. That the de facto taxi companies dispatch the car and driver via smartphone does not distinguish their business activity from that of traditional taxis, which also now use smartphones as one means of connecting driver and passenger.

46. TNCs are an unlicensed and unregulated taxi service.

47. This massive illegal operation puts the public and consumers at risk in many ways.

48. Use of a smartphone app does not change the nature of the business. It does not alter the need for uniform rules for all who engage in it. Use of an app merely provides an alternative means of dispatch and payment.  The service provided by TNCs remains For-Hire Transportation.

49. An app does not make a car safer, qualify or train a driver, protect the passenger, or insure the public when accidents occur. Because cars, drivers and passengers exist and travel in the real world, not the virtual world, the same public safety concerns exist

regardless of how passenger and driver connect. Therefore, the rules governing the activity should be substantially the same for all.

50. The Taxi Regulations protect the public from dangerous cab drivers by requiring hackney license applicant's to meet many criteria before they can even apply for a license, including:

1. pass a standard examination demonstrating the ability to speak, read, write and understand the English Language and knowledge of the city streets and landmarks, the Commission Rules and Regulations and basic arithmetic;

2. participate in training as determined by the Inspector of Carriages, including eight (8) hours of ride along training;

3. undergo a criminal record check, which does not allow applicants to be licensed that have been convicted or any of the following within the past seven (7) years: felony, involvement in illegal lottery, violation of parole or probation, sex offense, assault and battery or disobeying the directive of a police officer, narcotic or alcohol offense, illegal possession of a firearm;

4. drivers may not have more than four (4) motor vehicle violations;

51. The de facto taxi operators do not have to meet the strict criteria set forth above.

52. Once drivers have a license they must abide by a strict standard of rules, requiring them not to possess alcohol in their vehicle, not to talk on a cell phone, not to smoke or permit smoking.

53. The de facto taxi operators do not have to meet any such requirements.

54. The City requires taxi operators to invest in and operate only cars that are of a certain age and body style, and are subject to regular City inspections.

55. But the City allows de facto taxi companies to deploy private drivers in their own personal cars of any age or condition with no inspection requirement.

56. The City requires that all taxis have a protective barrier (referred to as a partition) of metal and lexan between the front and back seats. These barriers not only protect drivers from assault and theft but also protect the driver from impaired passengers that may interfere with the driver's ability to operate the taxi thereby causing an accident.

57. The de facto taxi companies have no such requirement.

58. Taxi operators are required to maintain expensive primary commercial liability insurance that applies at all times to the taxis. But the de facto taxi companies are not required to carry such commercial insurance and are knowingly permitted to give uninsured rides to unwary residents and visitors without insurance.

59. The City sets meter rates for traditional taxis that apply to all taxi rides, even when taxis accept passengers via a smartphone dispatch in an identical fashion as the de facto taxis. Yet the City permits the de facto taxi companies to charge any rate, and to impose large surcharges during times of high demand.

60. The City requires many owners of taxis to service all individuals and does not allow drivers to refuse to provide service except in very limited circumstances, but it imposes no such obligation on the de facto taxi companies. Such arbitrary favoritism damages the Plaintiff's members by reducing their revenues. It also seriously handicaps their ability to compete fairly against the de facto taxi companies to recruit drivers, which threatens to destroy their businesses entirely.

61. The City has now destroyed property rights and permitted the de facto taxi companies to flout the law with open impunity by deploying an invasion of unlicensed cars and drivers with no requirement of any medallion or other meaningful investment or compliance with the City Taxi Regulations. As a result, taxicab revenue has declined substantially,

impairing their ability to honor his continuing obligations associated with paying for the medallion, the license fees and the insurance obligations the City continues to impose upon them (but not upon the de facto taxi companies).

62. Many medallion owners in Cambridge have simply handed their medallion over – turned it in because they could not continue to earn a living.

63. Many medallion owners in Cambridge have defaulted on their existing financial obligations.

64. The City has known about the TNCs operating since at least August of 2013, when it passed emergency regulations concerning TNCs (see Exhibit C).

65. The City stated that it was in the process of revising the for-hire vehicle regulations in order to modernize the regulations to "reflect and address the realities of the industry, especially considering the innovation that has occurred as a result of the use of new technology…" (see Exhibit C).

66. Despite those representations, the City has done nothing and has continued to allow the TNCs to operate without having to abide by any regulations whatsoever.  It is complete lawlessness.

67. While the Equal Protection Clause of the Constitution often permits government to draw distinctions that are rationally related to legitimate governmental interests, the distinctions summarized above and detailed below do not pass constitutional muster. They are arbitrary, fundamentally unfair and unconstitutional. The City has arbitrarily forced participants in the same business to operate by very different rules.

68. The constitutional protections of equal protection and due process rest on bedrock principles of fundamental fairness. Under our constitutional system, the government must

apply reasonable rules fairly to similarly situated persons. People engaging in the same business activity must be held to the same rules. The rules must rationally relate to a legitimate governmental objective. The City's disparate treatment of Plaintiff's members and TNCs violates all of these principles.

69. Principles of fundamental fairness also animate the constitutional right to just compensation when the government takes private property. That right is particularly important where, as here, the government itself created the property right, sold it to private parties and developed a system under which hundreds of private parties were induced and required by government to invest and risk hundreds of hundreds of thousands of dollars as a precondition to engaging lawfully in business. These constitutional protections – equal protection, due process and just compensation – allow people to take investment risks and allow businesses to compete fairly.

70. Certain transportation providers began to offer taxi services in Cambridge in open and blatant disregard of applicable City taxi ordinances and regulations, including the law requiring medallion ownership.

71. The de facto taxi companies operate unlicensed taxi services in open violation of City law to which the City deliberately turned a blind eye.

72. It has disrupted long-settled expectations and imposed very serious adverse consequences on the Plaintiff's members, who engaged in the taxi business in costly reliance upon and in compliance with the market created by the City Taxi Regulations.

73. The Defendants' actions also deprived Plaintiff's members of the fundamental property right that the City expressly granted with the sale of the medallion: the exclusive right of medallion owners to provide For-Hire Transportation in the City.

74. This deprivation has seriously devalued the taxicab medallions.

75. Requiring the TNCs to comply with the taxicab regulations is not only necessary to protect the health, safety and welfare of the public, but ensures the "same level playing field" for all taxicab operators, regardless of whether the rides are being generated by telephone, hailing a taxicab on the street or use of an internet app-based system.

76. This irrational economic disparity between similarly situated operators for hire violates the Due Process and Equal Protection clauses of the Fourteenth Amendment of the U.S. Constitution.


**COUNT I**
**DECLARATORY JUDGMENT**

77. The allegations set forth above are re-alleged and incorporated herein.

78. The rights, duties and legal privileges of the Plaintiff's members are affected, impaired and threatened because the City is allowing TNC's to operate without complying with the state and local law.

79. Plaintiff is entitled to a declaratory judgment that the Transportation Network Drivers are required to comply with state and local laws pertaining to taxicabs and that, until such compliance, they cannot engage in any form of "For-Hire Transportation".

80. There exists a substantial, present and justifiable controversy between the Plaintiff and the Defendants with respect to whether or not the existing law applies to TNCs and their drivers.


**COUNT II**
**INJUNCTIVE RELIEF**

81. The allegations set forth above are re-alleged and incorporated herein.

82. The Court should require the City to enforce the current Taxi Regulations as to the TNCs, as the TNCs are providing the same service and must be regulated similarly.

## COUNT III
## MONETARY DAMAGES

83. The allegations set forth above are re-alleged and incorporated herein.

84. In the absence of appropriate and timely injunctive relief, the Plaintiff's members are entitled to compensatory and special damages in an amount which will fairly and reasonably compensate them for the harm caused by the Defendants, in an amount to be determined at a trial of this matter.

85. The money damages amount to millions of dollars invested to purchase the medallions based on the system created by the City which has now been destroyed by the City.

## COUNT IV
## TAKINGS CLAUSE

86. The allegations set forth above are re-alleged and incorporated herein.

87. The City has violated the Takings Clause because medallions are property under Massachusetts law, medallion owners, and lenders holding security interests in medallions, own property that may not be taken by the City without payment of just compensation.

88. Before the Commonwealth and the City allowed the invasion of the de facto taxi companies, if someone wanted to provide taxicab services in the City, the City required that he or she buy or lease a medallion and comply with the City Taxi Regulations. In return, the medallion owner received the exclusive right to provide taxi services in the City.

89. A hallmark of property is the right to exclude, and exclusivity was an essential element of the medallion owners' property rights and determined the value of those rights.

90. Without compensation to the medallion owners or the lenders holding security interests in the medallions, the City has permitted and continues to permit the de facto taxi companies to usurp and trespass upon the exclusive property rights of medallion owners by providing those services without buying or leasing medallions or complying with the City Taxi Regulations. The City has thereby taken exclusive rights from medallion owners and transferred them to the de facto taxi companies without any compensation, let alone the just compensation that the Takings Clause requires.

## COUNT VI
## DUE PROCESS/EQUAL PROTECTION

91. The allegations set forth above are re-alleged and incorporated herein.

92. The City's unequal treatment of the taxicabs and the de facto taxi companies violates the Equal Protection Clause of the Fourteenth Amendment by permitting the de facto taxi companies to engage in the taxi business without incurring the costs and limitations of complying with applicable law, while requiring the taxicab drivers and owners and others similarly situated to comply with the City's extensive and costly Taxi Regulations, including the requirements to: purchase a medallion; pay annual license fees; maintain commercial liability and worker's compensation insurance; operate only newer, regularly inspected vehicles; satisfy driver-licensing requirements, and pay thousands of dollars annually per medallion in City and State fees and taxes.

93. Among the many ways in which the City has created an unlevel and unfair playing field is its disparate treatment of the taxicab drivers and owners and the de facto taxi companies concerning automobile liability insurance.

94. The disparate treatment regarding fares and fees lacks any rational basis, especially for rides arranged in advance through smartphone apps, and adds to the competitive disadvantage the City is imposing upon the taxicab owners and drivers.

95. The City's disparate treatment regarding driver qualifications lacks a rational basis.

96. The City's disparate treatment regarding vehicle age, condition, inspections and safety features lacks a rational basis, and adds to the competitive disadvantage the City is imposing upon the taxicab owners and drivers.

97. The disparate treatment regarding accessibility and payment lacks a rational basis, and adds to the competitive disadvantage the City is imposing upon the taxicab owners and drivers.

98. The City's refusal to require the de facto taxi companies to comply with these accessibility, availability and anti-discrimination rules has arbitrarily imposed greater obligations on the taxicab owners and drivers as compared to the de facto taxi companies, thereby exacerbating the competitive advantages they already garner from the City's arbitrary refusal to regulate them.

99. The Plaintiff's members are suffering and will continue to suffer direct and tangible injury and damages from the City's actions and inactions in that, without limitation, (i) the market and collateral value of the medallions and their marketability are being or will be reduced by the unequal application of the law, (ii) all who operate taxis directly or lease vehicles with medallions to drivers are being injured in that the revenues derived

from their lawful operations have been and will continue to be reduced as a result of the de facto taxi companies' operation.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in favor of the Plaintiff as follows:

A.  Declare that the existing state and local laws, including the Taxicab Rules and Regulations, applicable to the Transportation Network Companies are valid, and issue an order requiring the City to enforce the laws against the TNCs.

B.  Grant Plaintiff compensatory and special damages in an amount which will fairly and reasonably compensate them for the harm caused by the Defendants, in an amount to be determined at a trial of this matter;

C.  Grant Plaintiff any and all such other legal and equitable relief as the Court deems just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY.

Respectfully submitted,
By the Plaintiff,

_____/s/ Jenifer M. Pinkham_____
Jenifer M. Pinkham
BBO #658031
Tiffany L. Stichel
BBO #672713
Schlossberg, LLC
35 Braintree Hill Office Park
Suite 204
Braintree, MA 02184

781.848.5028
jpinkham@sabusinesslaw.com

Dated: June 29, 2016

G:\Cambridge Taxi Drivers & Owners Association, Inc. - CY015\CTDOA v. City of Cambridge - 002\Docs\Complaint062716.docx