UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAMBRIDGE TAXI DRIVERS AND OWNERS ASSOCIATION, INC., <br>                Plaintiff <br><br> v. <br><br> CITY OF CAMBRIDGE, MASSACHUSETTS, NICOLE MURATI FERRER, CHAIR OF THE CAMBRIDGE LICENSE COMMISSION, E. DENISE SIMMONS, MAYOR OF CAMBRIDGE, CHRISTOPHER BURKE, CAMBRIDGE POLICE COMMISSIONER, and RICHARD C. ROSSI, CITY MANAGER, <br>                Defendants | Civil Action No. 16-cv-11357-NMG |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Cambridge Taxi Drivers and Owners Association, Inc., which purports to be "an entity comprised of members who are taxi drivers and owners that operate and engage in the licensed taxi industry in Cambridge", seeks a preliminary injunction ordering the City of Cambridge (the "City") to enforce its Taxicab Rules and Regulations (the "Taxi Regulations") against Transportation Network Companies ("TNCs") operating within the City of Cambridge. This Court should deny the Plaintiff's request for injunctive relief because the Plaintiff has not demonstrated a substantial likelihood of success on its substantive legal claims, since the relief sought by the Plaintiffs contravenes and is pre-empted by the TNC-regulating legislation recently passed and signed by the Governor, which precludes and preempts local regulation of TNCs. In addition, the Plaintiff's request should be denied because as described further below, the Plaintiff has not demonstrated irreparable harm.

## FACTS

Plaintiff, which identifies itself as "an entity comprised of members who are taxi drivers and owners that operate and engage in the licensed taxi industry in Cambridge", alleges that in failing to enforce the City's Taxi Regulations against TNCs such as Uber and Lyft, the Defendants have violated Plaintiff's members' civil rights. Plaintiff alleges that in enforcing the City's Taxi Regulations against the taxi industry but not the TNCs, the City has effectuated a taking of the Plaintiff's members' property (namely, the value of their taxi medallions, which Plaintiff alleges to have been decimated by the unregulated operation of TNCs in the City). Plaintiff also alleges that in subjecting the taxi industry to the Taxi Regulations but not TNCs, the City has violated the Due Process and Equal Protection clauses. Simultaneously with its Complaint, Plaintiff filed a motion for preliminary injunction.[1]

As Plaintiff describes, by virtue of the authority delegated by statute, "[t]he Cambridge taxi industry is highly regulated by state statutes, city rules and ordinances and multiple agreements that specify how medallion owners, drivers and radio associations must operate …" *Complaint*, ¶ 9; G.L. c. 40, § 22 and G.L. c. 159. The City's License Commission, pursuant to those state statutes, special acts (including Chapter 95 of the Acts of 1922) and city ordinance, promulgated the City's Taxi Regulations which govern the taxicab industry in the City. *Complaint*, ¶ 11. A copy of the Taxi Regulations was attached to the Plaintiff's Complaint as Exhibit A. The City's Taxi Regulations requires that taxicabs have a taxicab medallion, which the City caps in number at 257. *Complaint*, ¶ 16. The Taxi Regulations further specify that taxicab drivers in the City must be licensed, meet a minimum age requirement, register their taxicab with the City, pay certain taxes, and supply their contact information to the City.

---

[1] The instant suit parallels one against the City of Boston that has been ongoing since 2015, *Boston Taxi Owners Association, Inc., et al. v. City of Boston, et al.*, D. Mass. Docket No. 15-cv-10100.

*Complaint*, ¶ 17. Taxicab operators in the City must also attend the Cambridge Taxi School, pass a written examination, and receive training from the medallion owner. *Complaint*, ¶ 18.

By contrast, TNCs, which are a relatively new addition to the City's transportation marketplace, are not subjected to the requirements of the Taxi Regulations. *Complaint*, ¶ 19. Plaintiff alleges that because both TNCs and taxicabs are in the business of providing transportation for hire in the City, they must be regulated in the same manner. *Complaint*, ¶ 3.

The City of Cambridge regulates taxicabs pursuant to the authority delegated by the legislature. G.L. c. 40, § 22; G.L. c. 159; Chapter 95 of the Acts of 1922. *Affidavit of Nicole Murati Ferrer* ("Murati Ferrer Aff."), attached hereto as Exhibit A, ¶ 2. Recognizing the expanding for-hire transportation market, the City has, since 2013 considered what, if any, changes are necessary to accommodate that expanding market. *Murati Ferrer Aff.*, ¶ 3. Initially, that conversation was focused on ways to facilitate modernization of the taxi industry so it could compete with other market participants. *Murati Ferrer Aff.*, ¶ 3. To that end, in 2013, the Cambridge City Council passed a policy order requesting that the City Manager confer with the Cambridge Advisory Taxicab Subcommittee (a body comprised of government officials and private parties) regarding recommendations for the modernization of the taxi industry in Cambridge. *Murati Ferrer Aff.*, ¶ 4.

Also in 2013, the City attempted to regulate TNCs by citing TNC drivers for having a non-conforming meter device (the smartphone used by TNC drivers rather than a traditional, approved meter). That effort was stymied by the Commonwealth's Division of Standards and ultimately the Superior Court. *City of Cambridge v. Gelaye, Uber Technologies, and Division of Standards*, Middlesex Superior Court Docket No. 12-03675.

In 2014, the City Council convened a roundtable meeting which included the Chair of the License Commission, to discuss how "new technologies" could be incorporated into the City's licensing programs. *Murati Ferrer Aff.*, ¶ 5. In 2015, acknowledging the state government's indication that it would regulate in this area, the City Council passed two policy orders expressing support for the state moving forward expeditiously. *Murati Ferrer Aff.*, ¶ 6. In late 2015 and early 2016, the City convened four meetings of a Taxi Industry Working Group, which brought together stakeholders for the purpose of discussing the future of taxicab regulation and the transportation-for-hire market in the City. *Murati Ferrer Aff.*, ¶ 7.

On July 31, 2016, both houses of the Massachusetts Legislature passed H.B. No. 4570, entitled "An Act regulating transportation network companies." That legislation, which was signed by Governor Baker on August 5, 2016 (a copy of the law, Chapter 187 of the Acts of 2016, is attached hereto as Exhibit B), establishes a state-level regulatory framework for TNCs that includes a division of the Commonwealth's Department of Public Utilities "that shall have jurisdiction over transportation network companies to ensure the safety and convenience of the public, as expressly set forth in this chapter." *Exhibit B*, SECTION 4, Section 2(a). The legislation further sets forth provisions for background checks, insurance requirements, TNC driver certificates, and more. Of particular relevance to the instant case is SECTION 4, Section 10, in which the Legislature prohibits municipalities from imposing additional requirements upon TNCs:

> Except where expressly set forth in this chapter, no municipality or other
> local or state entity, except the Massachusetts Port Authority, may: (i)
> impose a tax on or require any additional license for a transportation
> network company, a transportation network driver or a vehicle used by a
> transportation network driver where the tax or licenses relate to facilitating
> or providing pre-arranged rides; (ii) require any additional license for a
> transportation network company or transportation network driver; or (iii)
> subject a transportation network company to the municipality's or other

local or state entity's rates or other requirements, including but not limited to entry or operational requirements; provided, however, that a municipality or other local or state entity may regulate traffic flow and traffic patterns to ensure public safety and convenience.

## ARGUMENT

### I.      Standard of Review

"In considering a request for a preliminary injunction, a trial court must weigh several factors: (1) the likelihood of success on the merits; (2) the potential for irreparable harm to the movant in the absence of an injunction; (3) the balance of the movant's hardship if relief is denied versus the nonmovant's hardship if the relief is granted; and (4) the effect, if any, of the decision on the public interest. Here, Plaintiff does not seek a typical injunction whereby the Defendants would be ordered to maintain the status quo. Instead, they ask this Court to order a mandatory injunction to effectuate an alteration to the status quo – for the Taxi Regulations to be enforced against TNCs operating in Cambridge. In doing so, Plaintiff's burden is heightened; "[b]ecause a mandatory preliminary injunction alters rather than preserves the status quo, it normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Braintree Labs., Inc. v. Citigroup Global Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (internal quotation marks omitted). Indeed, "[t]he moving party has a greater burden when it seeks a 'mandatory' preliminary injunction that would compel the non-moving party to perform an affirmative act" as opposed to an injunction seeking to preserve the status quo pending trial. *Northeastern Univ. v. BAE Sys. Info. And Elec. Sys. Integration, Inc.*, C.A. No. 13-12497-NMG, 2013 WL 6210646 at *7 (D. Mass. Nov. 27, 2013).

### II.     Plaintiff Has Not Demonstrated A Substantial Likelihood of Success

The Plaintiff's likelihood of success "is the touchstone of the preliminary injunction inquiry" *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998). "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir 2002). Here, the Plaintiff has not made the requisite demonstration, and the preliminary injunction inquiry need proceed no further.

### A.  Plaintiff's Requested Relief is Preempted by State Legislation

The relief sought by the Plaintiff – the imposition of local taxi regulations on TNCs – has now been expressly preempted by state legislation. Pursuant to the Massachusetts Constitution and statute, cities and towns may "exercise any power or function which the general court has power to confer upon it, which is not inconsistent with the constitution or laws enacted by the general court…" Amendments to Massachusetts Constitution, Article LXXXIX, section 8; G.L. ch. 43B, §13. On August 5, 2016, Governor Baker signed House No. 4570, which expressly prohibits municipal regulation of TNCs. *Exhibit A*, SECTION 4, Section 10. That express prohibition on municipal regulation is precisely the type of "legislative intent to preclude local action" that constitutes express preemption of any city ordinance or regulation of TNCs. *Bloom v. City of Worcester*, 363 Mass. 136, 155 (1973).

The Plaintiff's argument that the City may regulate TNCs pursuant to the power delegated by the Legislature to regulate taxicabs must fail in light of this clear expression of legislative intent. It is apparent that the Legislature: (a) does not consider TNC regulation to be within the ambit of the authority delegated to cities and towns to regulate taxicabs, and (b) has reserved the regulation of TNCs to the Commonwealth. As such, the City cannot be faulted for its alleged failure to regulate TNCs, nor can it be mandated to do so going forward. Because the

City's alleged failure to regulate TNCs is the purported basis for the Plaintiff's claims against the Defendants, Plaintiff's claims fail and must be dismissed against all Defendants.

### B. Counts I-III Are Not Independent Causes of Action, but Rather Prayers for Relief

Counts I through III purport to state claims for declaratory judgment (Count I), injunctive relief (Count II), and monetary damages (Count III). Despite Plaintiff's recitation of these as substantive causes of action, they are in fact prayers for relief which are moot unless the Plaintiff prevails on a substantive legal claim. The 1st Circuit has established that the Declaratory Judgment Act (28 U.S.C. § 2201(a) "creates a remedy, not a cause of action." *Buck v. American Airlines*, 476 F.3d 29, 33 n.3 (1st Cir. 2007). Entry of a declaratory judgment is not mandatory and falls within the Court's discretion, to be exercised in view of "considerations of practicality and wise judicial administration." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995). Where the Plaintiff asks this Court to declare the rights and obligations of TNCs, who are not parties to the litigation and have not been afforded the right to be heard, declaratory judgment would not constitute wise judicial administration. Moreover, where the requested declaratory judgment would contravene state legislation vesting sole responsibility for regulating TNCs with the Commonwealth, granting the Plaintiff's requested declaratory judgment would not serve the intended purpose of creating certainty for the Plaintiff. Also, requests for injunctive relief and for monetary damages require some underlying cause of action upon which to stand. As such, if the Court dismisses Count IV and VI (the only two substantive claims), Counts I-III should also be dismissed.[2]

---

[2] The Complaint contains no Count V. Therefore, despite the numbering in the Complaint that indicates the presence of six counts, there are in fact only five counts pled.

### C.  <u>Count IV, Plaintiff's Takings Claim, Fails</u>

Plaintiff's first substantive argument – that the Defendants have unlawfully "taken" the value of its members' taxi medallions – fails because Plaintiff's members have no constitutionally-protected interest in a particular value of their medallions. The takings claim fails for the additional reason that Plaintiff alleges no affirmative government action that effectuated the alleged taking.

<ol><li style="list-style-type: decimal;"><u>Plaintiff's Members Have No Constitutionally-Protected Interest In the Market Value of their Medallions</u></li></ol>

Plaintiff claims that by allowing TNCs to operate in Cambridge. the Defendants have eliminated the medallion owners' exclusive right to provide taxi services in the City and unlawfully deprived them of the economic value of their medallions. However, while Plaintiff's members may argue that they have a property interest in their medallions,[3] they have no constitutionally protected property interest in the transportation-for-hire market or in their medallions carrying a particular value.

A successful takings claim requires a showing that the City took the Plaintiff's member's private property without just compensation. Plaintiff does not argue, nor could it, that the City took its members' medallions.[4] Instead, Plaintiff argues that the City effectuated the taking by allowing additional, unregulated market entrants (the TNCs), which had the effect of substantially decreasing the value of its members medallions. Plaintiff claims that its members' medallions gave them an exclusive right to engage in the transportation-for-hire industry in Cambridge, and therefore the right to exclude others from that industry. However, Plaintiff's

---

[3] Defendants do not concede that the Plaintiff's members have a property interest in their medallions, but instead focus here on what the Plaintiff alleges its members to have been deprived of – not the medallions themselves, but a particular market value of those medallions.

[4] Plaintiff's members still possess their medallions, and with those medallions, their right to participate in the taxicab industry in Cambridge. That right is, legally speaking, unaffected by the entrance of TNCs to the market. Nothing about the operation of TNCs has affected the right of Plaintiff's members to use their medallions.

members have no constitutionally-protected interest in their medallions' market value or in the transportation-for-hire market.[5] Moreover, as described above, newly-enacted state law definitively acknowledges the existence of TNCs and regulates their activities.

A hallmark of a property right is the right to exclude others from that property. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). Here, however, although medallion owners may exclude others from the use of their medallion, medallion owners have no right to exclude or otherwise control the participants in the transportation-for-hire market in Cambridge and as such, have no property right in that market. The medallion owners cannot have a property interest in a market that is "subject to pervasive Government control,' because the government's ability to regulate in the area means an individual 'cannot be said to possess the right to exclude.'" *Dennis Melancon v. City of New Orleans*, 703 F.3d 262, 272 (5th Cir. 2012) (quoting *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 216 (Fed. Cir. 1993). At most, medallion owners arguably hold only "a unilateral expectation that regulation would not disrupt the secondary market value" of their medallions. *Id.* at 274.

Here, the medallion owners purchased their medallions knowing that the City could, at any time, alter the number of medallions available under the Taxi Regulations.[6] The City also retains the right, under the Taxi Regulations, to revoke or suspend medallions, or to alter the requirements placed upon medallion holders. Indeed, the City could eliminate the cap on the number of medallions in the City altogether. As the Eighth Circuit held when the City of Minneapolis did just that, even abolishing the cap on medallions would not constitute an

---

[5] Indeed, the transportation-for-hire market is not limited to TNCs and taxicabs, and include subways, buses, shuttles, bicycle and car-rental services, to name a few.
[6] The City's medallion requirements are also set forth in Section 5.20 of the Cambridge Municipal Code.

unlawful taking because the owners are not entitled to "an unalterable monopoly over the …

taxicab market" and taxicab owners "ought to be aware of the possibility that new regulation

might even render [their] property economically worthless." *Minneapolis Taxi Owners Coalition*

*v. City of Minneapolis*, 572 F.3d 502 508-509 (8th Cir. 2009). In an industry that Plaintiff

acknowledges to be highly regulated, Plaintiff's members have no right to exclude or otherwise

dictate the market participants. That alone is fatal to Plaintiff's takings claim.

### 2.  Plaintiff Alleges No Affirmative Act That Would Effectuate a Taking

Even if the Plaintiff could argue that its members have a constitutionally-protected

property interest in the transportation-for-hire market, its takings claim would fail for the

additional reason that that the Defendants took no affirmative action to deprive the Plaintiff's

members of that interest. Plaintiff contends that its members were deprived of their property by

the inaction of the City – the failure to enforce the Taxi Regulations against the TNCs – rather

than by taking any action against its members or their medallions. But a taking cannot occur

without an affirmative act. *Valles v. Pima County*, 776 F. Supp. 2d 995, 1003 (D. Ariz. 2011) (no

taking occurred in the absence of an "affirmative, overt action by the government …");

*Nicholson v. United States*, 77 Fed. Cl. 605, 620 (2007) (holding that the Court of Federal

Claims "has consistently required that an affirmative action on the part of the Government form

the basis of the alleged taking." Therefore, the Plaintiff's takings claim fails for the additional

reason that the City's alleged failure to enforce the Taxi Regulations against TNCs cannot, as a

matter of law, form the basis for a claim that the City "took" the "property" of taxicab medallion

holders.

3. Plaintiff's Allegation that the City Fails to Enforce the Taxi Regulations Against the TNCs Does Not Constitute a Regulatory Taking

Even if the Plaintiff could demonstrate that its members have a constitutionally-protected property interest in the transportation-for-hire marketplace (which it cannot) and that the City took that property (which it did not) by failing to enforce the Taxi Regulations against TNCs, Plaintiff's takings claim fails for the additional reason that the Plaintiff cannot show that "some significant restriction [was] placed upon an owner's use of his property for which 'justice and fairness' require that compensation be given." *Maine Educ. Ass'n. Benefits Trust v. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2012) (quoting *Philip Morris v. Reilly*, 312 F.3d 24, 33 (1st Cir. 2002)). The Supreme Court has set forth a three-pronged test to guide the Court's analysis as to whether a regulatory taking has occurred: (1) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; (2) the regulation's economic impact on the property owner; and (3) the character of the government action. *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Here, none of those inquiries support Plaintiff's claim that a regulatory taking has occurred.

As to the first prong, the Plaintiff's members cannot claim to have any reasonable investment-backed expectation as to the value of their medallions, because the market that confers that value is so highly controlled by government regulation. The Plaintiff's members cannot reasonably have expected that the City could never alter the number of available medallions, that there could never be new market entrants, or even that the medallion system would always exist in its current form. Indeed, as the 1st Circuit has observed, such expectations of market value must be "tempered by the fact that [a market participant] operates in [a] highly regulated … industry." *Franklin Mem. Hosp. v. Harvey*, 575 F.3d 121, 128 (1st Cir. 2009). "[T]he Supreme Court has recognized that heavy government regulation may diminish a property

owner's expectations." *Id.* (citing *Lucas v. S. C. Coastal Council*, 505 U.S. 1003, 1027-28 (1984).

Plaintiff's claim fares no better under the second prong, which asks the Court to analyze the regulation's impact upon the property owner. Here, there is no change in regulation that impacted the medallion owners. Plaintiff alleges no new requirement imposed by the City that impairs the property rights of its members. Instead it alleges that new market entrants, who operate with fewer restrictions than its members, have diluted the value of its members' investments. This argument that its members' property rights have decreased in value by virtue of the City's inaction against TNCs cannot satisfy this prong because Plaintiff can point to no change in regulation that impacted its members.

Similarly, under the third prong, which requires the court to analyze the "character of the government action," the government action here is less intrusive than the action contemplated by the Supreme Court in *Penn Central*, *supra*. There, the Court explained that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when [the] interference arises by some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124. Where, as here, the government is alleged to have failed to act, rather than to have acted overzealously, that inaction cannot be found to constitute interference so substantial as to support a finding that a regulatory taking occurred.

D. **Count VI, for Violation of the Due Process Clause or the Equal Protection Clause, Is Unlikely to Succeed on the Merits**

1. Count VI Fails to State a Claim for a Due Process Violation

Plaintiff's Complaint, although it purports to state a claim for violation of the Due Process Clause of the 14th Amendment, articulates no specific theory as to how the City has

violated the Due Process Clause here. Plaintiff does not specify whether its claim is one for

violation of substantive due process rights or procedural due process rights; in either case, such a

claim would fail.

Assuming *arguendo* that Plaintiff intends to state a claim for violation of substantive due

process rights in the City's alleged deprivation of its members' property interest in their taxicab

medallions, that claim fails for the same reason that the Plaintiff has not adequately stated a

takings claim – because the Plaintiff's members have no constitutionally-protected interest in the

value of their medallions or in the transportation-for-hire market. *Section III.A., supra*.

If the Plaintiff intends to state a claim for violation of procedural due process rights, that

claim also fails. Here, the only arguable property right articulated by the Plaintiff – in its

members' medallions – still belongs to its members. There can be no due process violation where

the Plaintiff's members still possess their medallions, and with them, the right to operate taxicabs

in the City.

## 2. Plaintiff's Equal Protection Claim Fails

To state a claim for violation of the Equal Protection Clause, Plaintiff must show that its

members are similarly situated to TNC drivers/operators, that they are being treated differently,

and that there is no "rational relationship between the disparate treatment and a legitimate

government objective." *Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 145 (1st Cir. 2001); *Rocket

Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 10 (1st Cir. 2013). In the area of economic

regulation such as those at issue here, rational basis review affords the government a "strong

presumption of validity." *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 (1st Cir. 2003)

(internal citation omitted).

Here, despite the Plaintiff's characterization, there exist several important distinctions

between taxicab operators and TNC operators. Taxis are hailed on the street or at public taxi

stands (or, in some cases, by smartphone app); TNC rides are arranged solely through a smartphone app and TNC drivers may not offer their services at taxi stands or be hailed on the street. TNCs require a previous relationship with a customer (an account) before a customer may arrange a ride. TNC fare rates may vary based on traffic conditions; taxicabs offer customers the certainty of a metered fare dictated by regulation. Taxicab fares can be paid with vouchers or cash; TNC fares cannot. Taxicab rides can be prearranged with a dispatch service; TNC rides cannot. A taxicab customer's relationship is with the driver; a TNC customer's relationship is with the TNC itself, to whom payment is submitted. Taxicabs are subject to City ordinances and regulations when their trip originates in Cambridge; TNC trips can originate anywhere. In sum, that both provide means of transportation for hire does not mean that they are similarly situated.

Even if the Court were inclined to find that taxicabs and TNCs are similarly situated, the City has a rational basis for treating them differently during this period of political, legal, and regulatory uncertainty. The existence of TNCs is relatively new, and was not contemplated when the City promulgated its Taxicab Regulations. The City has, over the past three years, been engaged in an ongoing process of evaluating whether, and what, new regulation may be necessary in light of the proliferation of TNCs. These efforts reach back to 2013, when the City convened a Cambridge Advisory Taxicab Subcommittee comprised of government officials and private parties charged with making recommendations to modernize the taxi industry. Most recently, the City convened a Taxi Industry Working Group that met in late 2015 and early 2016 to discuss possible recommendations. In light of indications from state officials that they would offer legislation aimed at regulating TNCs, the City Council went on record urging state government to "move expeditiously" in issuing regulations that would apply to TNCs. *See* City Council Policy Order Resolutions O-15 and O-24, August 10, 2015.

Amidst these conversations, in 2013, the City attempted in 2013 to regulate TNCs by citing TNC drivers for having a non-conforming meter device (the smartphone used by TNC drivers rather than a traditional, approved meter). That effort was stymied by the Commonwealth's Division of Standards and ultimately the Superior Court. *City of Cambridge v. Gelaye, Uber Technologies, and Division of Standards*, Middlesex Superior Court Docket No. 12-03675.

Having been told by the state that it would step in and offer regulation, and having been turned away by the Court when the City attempted to hold TNC smartphones to the same standards as traditional metering devices, the City made a rational, reasonable policy decision to support the state's professed intention to regulate in this area. Simultaneously, the City continued to evaluate its regulations with the goal of avoiding a situation where City and state laws and regulations conflict.

The City's approach was validated on July 31, 2016, when the Massachusetts Legislature passed H.B. 4570, which sets forth various state-level requirements for TNCs and TNC drivers, establishes a division of the state Department of Public Utilities to oversee compliance with these requirements, and prohibits municipalities from imposing different or additional requirements upon TNCs. The reasonable policy decision of the City to defer large-scale changes to its regulation of taxicabs and TNCs pending state legislation – legislation which has now been passed and was signed by the Governor on August 5, 2016 – meets the showing required by the City under rational basis review. The Commonwealth itself has determined that taxicabs and TNCs are not similarly situated.

### E.  All Claims Against Mayor Simmons Are Unlikely to Succeed on the Merits Because She Has No Authority to Enforce the Taxi Regulations

Mayor Simmons is one of nine elected Cambridge City Councilors who, according to the City's charter, are the City's legislative body. By operation of the City's charter, the Mayor of Cambridge is elected from among the nine City Councilors, and "shall be recognized as the official head of the city for all ceremonial purposes" and "shall be chairman of the city council and chairman of the school committee", but it is the City Manager who "shall be the chief administrative officer of the city and shall be responsible for the administration of all departments, commissions, boards and officers of the city." G.L. c. 43, §§ 100, 103. As such, Mayor Simmons is not vested with the authority to enforce (or not enforce) the Taxi Regulations. Nor is Mayor Simmons alleged to have taken any action with respect to the Plaintiff or its members. Therefore, the claims against her in all capacities are unlikely to succeed.

### F.  To The Extent that the Complaint Purports to Assert Claims Against the Individual Defendants in their Individual Capacities, The Individual Defendants Are Entitled to Qualified Immunity

To the extent that Plaintiff has brought claims against Defendants Nicole Murati Ferrer (Char of the Cambridge License Commission), Christopher Burke (Cambridge Police Commissioner), and Richard C. Rossi (Cambridge City Manager) (collectively, the "Individual Defendants") in their official capacities, those claims are claims against the City and are addressed above. *See Monell v. Dep't. of Social Services of the City of New York*, 436 U.S. 658, 691 (1978) ("official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent…"). However, to the extent that the Plaintiff

intends to assert its claims against the Individual Defendants in their individual capacities, the Individual Defendants are entitled to qualified immunity.[7]

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Courts are to examine two questions in resolving a claim of qualified immunity: whether the Plaintiff has alleged facts that make out a violation of a constitutional right, and whether that constitutional right was "clearly established" at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Only when a defendant's alleged misconduct violated a clearly established constitutional right does that defendant lose the protection of qualified immunity. *Id.*

Here, Plaintiff does not – and cannot – show that any of the Individual Defendants violated Plaintiff's members' clearly established constitutional rights. As an initial matter, Plaintiff alleges that the Taxi Regulations have existed for "decades" – long prior to the appointment of Nicole Murati Ferrer as Chair of the License Commission in January, 2016; the appointment of Christopher Burke as Acting Police Commissioner in May, 2016; or the appointment of Richard C. Rossi as City Manager in 2013. Plaintiff does not – and cannot – allege any particular act on the part of any of these Individual Defendants in the promulgation of the Taxi Regulations. The most that can be said about the Individual Defendants is that they have not (yet) revised the Taxi Regulations or ordered that the Taxi Regulations be applied to TNCs.

---

[7] Plaintiff does not affirmatively assert that it is making any claims against the Individual Defendants in their individual capacities, nor do the factual allegations include any allegation that the Individual Defendants acted in anything other than their official capacities.

That alone cannot constitute a violation of any clearly established constitutional right of the Plaintiff, especially where the Legislature has expressly preempted local regulation. Plaintiff offers no basis for holding any of these three Individual Defendants liable (aside from in their official capacities, which is addressed above); indeed, aside from the caption of the Complaint, none of these three Individual Defendants is mentioned. Against that backdrop, there is no basis on which to conclude that any of these three Individual Defendants took any action to deprive the Plaintiff or its members of any constitutionally-protected right, let alone a "clearly established" constitutional right.

III.    **Plaintiff Will Not Suffer Irreparable Harm Absent the Requested Injunction; It Is the City That Would Suffer More Harm If Relief Is Granted.**

As the Plaintiff itself acknowledges, the Taxi Regulations have existed for "decades"; TNCs were operating in Cambridge as early as 2013, when the City brought suit in Superior Court in its attempts to hold TNC smartphones to the same standards as taxicab metering devices. Notwithstanding that, Plaintiff did not file suit until June, 2016. It is therefore difficult to understand how a failure to grant the requested injunction at this particular moment in time will cause the Plaintiff or its members irreparable harm. Plaintiff's members have no less ability to exercise the privileges granted them under their medallions than they did in 2013. Plaintiff paints a dire picture of steep decline in the market value of those medallions, and attributes that decline to the alleged unregulated operation of TNCs in Cambridge, but offers no reason why they face irreparable harm *now* that differs from any other point in time. Moreover, to the extent that the Plaintiff alleges that its members are suffering monetary harm under the status quo, an adequate remedy would exist for that alleged harm even without a preliminary injunction – the potential monetary damage award that could result after trial of this matter, if Plaintiff's claims survive the pleadings stage.

By contrast, the City and the public stand to suffer harm if its regulatory process is interrupted by the requested injunction. As this Court noted in the context of the parallel action against the City of Boston, "federal courts considering equitable remedies must exercise discretion to 'avoid … needless friction with state policies.'" *Boston Taxi Owners Assoc., Inc.*, *et al. v. City of Boston, et al.*, D. Mass. C.A. No. 15-cv-10100-NMG, Document 66, p. 41 (quoting *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500-01). Where the Massachusetts legislature has just passed, and the Governor has signed, a comprehensive bill regulating TNCs – a bill that would prohibit the City from imposing its own regulations on TNCs – to grant the requested injunction would unnecessarily disrupt the complex political, legislative, and administrative process that is right now directly addressing the issues raised by this lawsuit.

**IV.    The Public Interest Weighs Against Granting the Requested Relief.**

The public interest is served by allowing the legislative process to continue working to adapt the regulation of taxicabs to the modern for-hire transportation market. The Plaintiff's requested injunction would disrupt the status quo and place the City at odds with the new legislation. In view of the recently enacted legislation and the Legislature's express statement that TNC regulation is a matter for the Commonwealth and not municipalities, the public interest is not served by judicial intervention.

**CONCLUSION**

For the foregoing reasons, the Defendants respectfully request that Plaintiff's Motion for Preliminary Injunction be denied.

Respectfully submitted,

CITY OF CAMBRIDGE, MASSACHUSETTS,
NICOLE MURATI FERRER, CHAIR OF THE
CAMBRIDGE LICENSE COMMISSION, E.
DENISE SIMMONS, MAYOR OF CAMBRIDGE,
CHRISTOPHER BURKE, CAMBRIDGE POLICE
COMMISSIONER, and RICHARD C. ROSSI,
CITY MANAGER

By their attorney,

 /s/ Anne Sterman
Anne Sterman, BBO #650426
Asst. City Solicitor
Law Department – City Hall
795 Massachusetts Avenue
Cambridge, MA 02139
(617) 349-4121
DATED:        August 16, 2016        asterman@cambridgema.gov

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants on August 16,
2016.

/s/ Anne Sterman
Anne Sterman
Assistant City Solicitor